UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
IN RE: LEHMAN BROTHERS INC.,            :
                                        :
                        Debtor.         :
----------------------------------------X
                                        :
CARVAL INVESTORS UK LIMITED, as manager :
of CVF Lux Master S.a.r.l., the assignee :   13 Civ. 5381 (DLC)
of Doral Bank and Doral Financial       :
Corporation, and HUDSON CITY SAVINGS    :
BANK,                                   :
                                        :
                        Appellants,     :
                                        :
            -v-                         :
                                        :   OPINION & ORDER
JAMES W. GIDDENS, as Trustee for the SIPA :
Liquidation of Lehman Brothers Inc.,    :
                                        :
                        Appellee.       :
                                        :
----------------------------------------X
                                        :
FEDERAL DEPOSIT INSURANCE CORPORATION, as :
receiver of Westernbank Puerto Rico,    :   13 Civ. 5964 (DLC)
                                        :
                        Appellant,      :
                                        :
            -v-                         :
                                        :
JAMES W. GIDDENS, as Trustee for the SIPA :
Liquidation of Lehman Brothers Inc.,    :
                                        :
                        Appellee.       :
----------------------------------------X

For appellants CarVal Investors UK Limited, as manager of the
assignee of Doral Bank and Doral Financial Corporation:

Luc A. Despins, and Bryan R. Kaplan
Paul Hastings LLP
75 East 55th Street
New York, NY 10022

1

For appellant Hudson City Savings Bank:

Hugh McDonald
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020

Gene R. Besen
Dentons US LLP
2000 McKinney Avenue, Suite 1900
Dallas, TX 75201


For appellant FDIC, as Receiver for Westernbank Puerto Rico:

Peter Feldman, and John Bougiamas
Otterbourgh, Steindler, Houston, & Rosen, P.C.
230 Park Avenue
New York, NY 10169


For appelleee James W. Giddens, Trustee:

Michael E. Salzman, James B. Kobak, Jr., Beatrice Hamza Bassey,
Savvas A. Foukas, Seth Schulman-Marcus, and Kathleen A. Walker
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004


For appellee the Securities Investor Protection Corporation:

Josephine Wang, and Kenneth J. Caputo
Securities Investor Protection Corporation
805 15th Street, N.W., Suite 800
Washington, DC 20005


DENISE COTE, District Judge:

CarVal Investors UK Limited, as manager of CVF Lux Master

S.a.r.l., the assignee of Doral Bank and Doral Financial Capital

(collectively, "Doral"), the Hudson City Savings Bank

("Hudson"), and the Federal Deposit Insurance Corporation ("FDIC"), as receiver of Westernbank Puerto Rico ("Westernbank"), appeal from a June 25, 2013 Order of the Bankruptcy Court denying them "customer" status under the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa <u>et seq.</u> ("SIPA"), with respect to their repurchase transactions with Lehman Brothers Inc. ("LBI") prior to its bankruptcy.  <u>See In re Lehman Bros. Inc.</u>, 492 B.R. 379 (Bankr. S.D.N.Y. 2013) ("Bankruptcy Decision").  For the following reasons, the decision of the Bankruptcy Court is affirmed.

BACKGROUND

The following description of the transactions at issue is taken from the Bankruptcy Decision.[1]  On April 6, 2012, appellee James W. Giddens, as trustee for the liquidation of LBI ("Trustee"), filed a motion in the Bankruptcy Court seeking approval of his decision to deny "customer" status under SIPA for a series of claims filed by Doral, Hudson, and the FDIC on behalf of Westernbank (collectively, the "Banks") with respect to long-term repurchase agreements between the Banks and LBI

---

[1] Although the Banks object to the Bankruptcy Court's failure to augment the record regarding an issue related to hypothecation, they make no other objection to the Bankruptcy Decision's description of the factual background to this dispute.  This Opinion does not reach the hypothecation issue.  Thus, for purposes of this Opinion, the facts set forth in the Bankruptcy Decision are undisputed and not objected to in this appeal.

("Agreements").

A repurchase agreement is a financial transaction consisting of two steps.  First, a seller (here, the Banks) delivers securities to a buyer (here, LBI) in exchange for a quantity of cash that is generally less than the value of the securities.  This difference in value is referred to as the "haircut."  Second, the parties agree that the buyer (LBI) will return those securities to the seller (Banks) on a future "repurchase date," in exchange for a cash payment from the seller (Banks) in the amount originally transferred, plus a financing charge, called a "repo rate."[2]

In September 1999, Hudson entered into two repurchase transactions with LBI for $100 million in securities.  Sometime prior to that date, LBI had offered Hudson long-term structured repurchase agreements as a means to finance Hudson's acquisition of a position in highly liquid mortgage-backed securities.  In 1998, Westernbank entered into three separate long-term structured repurchase agreements with LBI, each with a term of 15 years.  Westernbank's purpose for investing in the securities through its repurchase agreements was to receive the fixed

---

[2] While the Banks often refer to the Agreements as "reverse" repurchase agreements, the only difference between a regular and reverse repurchase agreement is one of perspective: a transaction is a repurchase agreement when viewed from the seller's side, and a reverse repurchase agreement when viewed from the buyer's side.

coupon income that was paid by the issuer of the securities. Between 2000 and 2001, Doral entered into six repurchase agreements with LBI.

All three Banks believed that they owned the securities transferred through the Agreements.  Hudson entered into the repurchase agreements with the expectation that it owned the underlying securities and that they would be returned. Westernbank considered the securities that it transferred to LBI as its own and treated them accordingly.  Similarly, Doral held the securities transferred to LBI as assets on its balance sheets and recorded the matching obligations to repurchase these securities on their respective repurchase dates as corresponding liabilities.

The securities transferred to LBI per the Agreements ("Purchased Securities"), were never returned to the Banks by LBI.  The Purchased Securities form the basis of the claims at issue.

Several aspects of the Agreements are particularly relevant to the principal dispute between the parties.  The Agreements were governed by an industry-standard Master Repurchase Agreement ("MRA"), which sets forth the basic rights of the parties to the transaction.  The MRA described the relationship between the Banks and LBI as a "business and contractual relationship" and stated that each party represents and warrants

that "it will engage in such transactions as principal."

The MRA protected both parties against changes in the value of the Purchased Securities by including a mark-to-market provision in all repurchase transactions.  If the value of the Purchased Securities fell, to ensure that LBI was fully collateralized, the Banks were required to deliver additional securities or cash to LBI to make up the shortfall.  Conversely, if the value of the Purchased Securities rose, the Banks were entitled to demand additional cash or Purchased Securities to rebalance the transaction.

Additionally, the MRA provided that LBI was free to use the Purchased Securities for its own purposes until the repurchase date.  LBI acquired full legal title over the securities, and -- subject to its obligation to provide the securities on the repurchase date -- it was free to sell, transfer, pledge, or hypothecate the Purchased Securities as it desired.  The Banks, for their part, retained an economic interest in the Purchased Securities, including the rights to receive all coupon interest and redemption payments.

These Agreements were "bilateral" repurchase arrangements. In contrast to "safekeeping" or "hold-in-custody" repurchase agreements where the underlying securities are kept in an internal safekeeping account by a buyer or seller throughout the duration of the agreement, in a "bilateral" repurchase agreement

6

a seller actually delivers securities to a buyer.  Accordingly, when the bilateral Agreements were initiated, the Banks transferred full legal title of the Purchased Securities to LBI and gave LBI discretion to use those securities in other repurchase agreements, sales, transfers, pledges, or hypothecations until the repurchase date.

LBI did just that.  It established separate accounts for each of the Banks with respect to the Purchased Securities, which would record transaction activities but would not, and did not, hold any of the Purchased Securities while the Agreements were open.  Accounts of this type are referred to as "delivery-versus-payment" ("DVP") accounts, as compared to custodial "safekeeping" accounts, in which LBI would segregate the customer's assets from those securities available for LBI to use in its proprietary business.  LBI then used the Purchased Securities for its own purposes, including in repurchase transactions or collateral pledges involving other counterparties.  Because the DVP accounts did not require LBI to retain cash or property in the accounts throughout the term of the Agreement, on the date that LBI commenced liquidation proceedings ("Commencement Date"), the Purchased Securities were not held by LBI, but were in the possession of third parties.

Following the bankruptcy of LBI, the Banks submitted timely claims asserting that they were entitled to recover under SIPA

as "customers" of LBI.  The Trustee denied these claims, and the
Banks filed a notice of objection.  The parties provided an
agreed-upon record to the Bankruptcy Court and submitted
extensive briefing on the issue of whether the Banks were
entitled to "customer" status under SIPA.

On June 25, 2013, the Bankruptcy Court affirmed the
Trustee's determination that the Agreements did not entitle the
Banks to SIPA "customer" status.  Relying in relevant part on
the Second Circuit's decision in In re Bernard L. Madoff Inv.
Secs. LLC, 654 F.3d 229 (2d Cir. 2011) ("Madoff"), the
Bankruptcy Decision recognized that a claimant's "cash or
securities must be entrusted with a broker-dealer in order to
qualify for customer protection under SIPA," and found that
because LBI did not hold any of the Purchased Securities in the
Banks' DVP accounts on the Commencement Date, "the key
possessory elements that are needed to establish entrustment" of
the Banks' securities were absent.  In re Lehman, 492 B.R. at
380, 388.  This conclusion was underscored by the fact that
LBI's right to hypothecate the Purchased Securities meant that
it had no legal obligation to hold these securities.  Id. at
388-90.  The Bankruptcy Decision also found unpersuasive the
Banks' reliance on a decision by the bankruptcy court of the
District of New Jersey, Cohen v. Army Moral Support Fund (In re
Bevill, Bresler & Schulman Asset Mgmt. Corp.), 67 B.R. 557, 599

(Bankr. D.N.J. 1986) ("Bevill Bresler").

Hudson and Doral filed a notice of appeal of the Bankruptcy Decision on August 1.  On August 12, Hudson and Doral moved to certify a direct appeal to the Second Circuit pursuant to 15 U.S.C. § 158(d)(2)(A).  At the request of the parties, briefing on the merits was stayed pending a determination of the motion for certification.  By Stipulation and Order of September 12, the FDIC indicated that it would neither oppose nor join the instant motion, but agreed that the Court's decision regarding certification will apply equally to the FDIC.  The Securities Investor Protection Corporation ("SIPC") filed an opposition to the motion for certification on August 30.[3]  The motion was fully submitted as of September 6.

By an Opinion of September 18, the motion for certification was denied ("September Opinion").  In re Lehman Bros. Inc., 13 Civ. 5381 (DLC) & 13 Civ. 5964 (DLC), 2013 WL 5272937 (S.D.N.Y. Sept. 18, 2013).  By an Order of September 19, a briefing schedule was entered for the merits of the appeal.  In addition to the appellees and the appellant, SIPC also filed a brief in support of the Bankruptcy Decision.  The appeal was fully briefed as of November 26.

---

[3] SIPC is deemed to be a party in interest in all matters arising under a SIPA litigation proceeding, and has "the right to be heard on all such matters."  15 U.S.C. § 78eee(d).

DISCUSSION

The standard of review applicable to matters within core bankruptcy jurisdiction is governed by the Federal Rules of Bankruptcy Procedure.  On appeal, the court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  Fed. R. Bankr. P. 8013.

"Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." Id.; see Solow v. Kalikow (In re Kalikow), 602 F.3d 82, 91 (2d Cir. 2010) (noting that "[f]indings of fact are reviewed for clear error"). Legal conclusions of the Bankruptcy Court, however, are "reviewed de novo." Id.

"In construing a statute, [courts] begin with the plain language, giving all undefined terms their ordinary meaning." Fed. Housing Fin. Agency v. UBS Americas Inc., 712 F.3d 136, 141 (2d Cir. 2013).  Courts "must presume that the statute says what it means."  Id. (citation omitted).  "In interpreting a statute, however, courts are not to construe each phrase literally or in isolation."  Id. (citation omitted).  Courts "must attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole."  Id. (citation omitted).  Thus, "the preferred meaning of a statutory provision is one that is consonant with the rest of the statute."  Auburn Hous. Auth. v.

10

Martinez, 277 F.3d 138, 144 (2d Cir. 2002).

The issues the Banks raise on appeal center exclusively on the definition of "customer" under SIPA.  In essence, the Banks challenge the Bankruptcy Decision's interpretation of the "entrustment" requirement for customer claims under SIPA.

Congress enacted SIPA in 1970 to provide special protections in bankruptcy to a specific class of individuals who were harmed when a broker-dealer became insolvent:

> Following a period of great expansion in the 1960's, the securities industry experienced a business contraction that led to the failure or instability of a significant number of brokerage firms.  Customers of failed firms found their cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings.  In addition to its disastrous effects on customer assets and investor confidence, this situation also threatened a "domino effect" involving otherwise solvent brokers that had substantial open transactions with firms that failed. Congress enacted the SIPA to arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers.

Secs. Investor Prot. Corp. v. Barbour, 421 U.S. 412, 415 (1975) (emphasis added).  SIPA provided that "[t]he [insolvent] firm's clients are cushioned (within limits) from personal loss through a special fund collected by SIPC from all securities dealers registered under the 1934 Securities Exchange Act (much in the way that the Federal Deposit Insurance Corporation protects the depositors of banks)."  SEC v. F.O. Baroff Company, Inc., 497 F.2d 280, 281 (2d Cir. 1974) ("Baroff").  "But [SIPA] allows

only those who meet its definition of a 'customer' to share in this assurance." Id.

As of the Commencement Date, SIPA provided the following statutory definition of "Customer":

> any person (including any person with whom the debtor deals as principal or agent) who has
> [1] a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer
> [2] from or for the securities accounts of such person
> [3] for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer.
>
> The term 'customer' includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities, but does not include --
>
> (A) any person to the extent that the claim of such person arises out of transactions with a foreign subsidiary of a member of SIPC; or
>
> (B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor.

15 U.S.C. § 78$lll$(2) (2006) (emphasis added).

In Baroff, the seminal case regarding the SIPA definition of "customer," the Second Circuit rejected a "literal" reading of the definition as failing "to accommodate the patent

legislative purposes." 497 F.2d at 282. Because Congress had intended SIPA to protect customers who had left cash and securities deposited in their brokerage accounts when the broker-dealer went bankrupt, see Barbour, 421 U.S. at 415, the Baroff court read into the SIPA customer definition an entrustment requirement, observing that Congress "stressed protection to . . . the public customer who has entrusted securities to a broker for some purpose connected with participation in the securities markets." Baroff, 497 F.2d at 283 (emphasis added). The Second Circuit has recently reiterated that "the critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities." Madoff, 654 F.3d at 236 (original emphasis omitted; new emphasis added) (citation omitted); see also In re New Times Sec. Servs., Inc., 463 F.3d 125, 128 (2d Cir. 2006) ("New Times").

In explaining this entrustment requirement, the Baroff court noted that Congress's emphasis in enacting SIPA protections was "on the customer as investor and trader, not on others who might become creditors of the broker-dealer for independent reasons." 497 F.2d at 283. Accordingly, the Baroff court held that "customers" are those claimants who convey cash or securities to a broker through an agreement that has "the indicia of the fiduciary relationship between a broker and his

13

public customer" and not of "an ordinary debtor-creditor relationship."  Id. at 284 (emphasis added).  "Whether an individual enjoys 'customer' status thus turns on the transactional relationship."  New Times, 463 F.3d at 128 (citing Baroff).

Although Baroff did not state a definition for a "fiduciary relationship," this Circuit has since described the relationship, as recognized at common law, as follows:

> At the heart of the fiduciary relationship lies reliance, and de facto control and dominance.  The relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other.  One acts in a "fiduciary capacity" when
>
>> the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part.
>
> Black's Law Dictionary 564 (5th ed. 1979).
>
> A fiduciary relationship involves discretionary authority and dependency: One person depends on another -- the fiduciary -- to serve his interests. In relying on a fiduciary to act for his benefit, the beneficiary of the relation may entrust the fiduciary with custody over property of one sort or another. Because the fiduciary obtains access to this property to serve the ends of the fiduciary relationship, he becomes duty-bound not to appropriate the property for his own use. . . . These characteristics represent the measure of the paradigmatic fiduciary relationship.

United States v. Chestman, 947 F.2d 551, 568-69 (2d Cir. 1991) (en banc) (citation omitted).

A fiduciary relationship was found lacking in <u>Baroff</u> when the claimant conveyed securities to a broker-dealer but the securities "had nothing at all to do with conventional investment, trading or participation in the securities market," "[t]here was no actual or likely use of the shares as collateral for margin purchases by [the claimant] of other securities," "the proceeds [were not] used to facilitate securities trading by [the claimant]," "there was no reasonable expectation that the shares would be sold for [the claimant's] account in the near future," "the proceeds of the [transaction] were used . . . by [the broker-dealer] without restriction in its day-to-day business," and when the transaction "had no connection with [the claimant's] trading activity in the securities market." <u>Baroff</u>, 497 F.2d at 284.

SIPA places the burden of proof to establish "customer" status on the claimant by requiring that a debtor's obligations to its customers be "ascertainable from the books and records of the debtor" or "otherwise established to the satisfaction of the trustee." 15 U.S.C. § 78fff-2(b); <u>see also</u> <u>In re Primeline Secs. Corp.</u>, 295 F.3d 1100, 1107 (10th Cir. 2002) (stating that the burden of proof lies on the claimant to prove "customer" status under SIPA).

The Banks do not qualify as "customers" under SIPA. The Banks have not met their burden of demonstrating the existence

of a fiduciary relationship between the Banks and LBI.
Fundamentally, the two-sided nature of the Agreements belies any
inference of a fiduciary relationship.  A fiduciary relationship
between a customer and a broker-dealer ordinarily arises because
the customer makes a transfer of cash or securities to the
broker-dealer.  With that transfer, the customer becomes
vulnerable and will suffer a loss if the broker-dealer
appropriates the money or becomes insolvent.  The customer thus
places trust and confidence in the broker-dealer to properly
manage his cash or securities, giving rise to a fiduciary duty
for the broker-dealer to act loyally for the customer's benefit.
See Chestman, 947 F.2d at 568-69.[4]

     The transactions here were not, however, one-sided
transfers.  In the Agreements, the Banks conveyed the Purchased
Securities in exchange for cash from LBI, subject to a haircut.
LBI was not "entrusted" with the Bank's securities but rather
was the intended counterparty in a sophisticated financial
transaction.  As such, the Agreements had the characteristics of
an ordinary debtor-creditor relationship.

     Further evidence in the record confirms this conclusion.

---

[4] The scope of the fiduciary duty varies with the nature the
broker-dealer relationship.  There is a general fiduciary duty
in discretionary brokerage accounts, see United States v.
Skelly, 442 F.3d 94, 98 (2d Cir. 2006), but a more limited one
in non-discretionary accounts.  Press v. Chemical Investment
Servs. Corp., 166 F.3d 529, 536-37 (2d Cir. 1999).

The MRA describes the relationship between the Banks and LBI as "contractual" and disavows any fiduciary, principal-agent relationship.  LBI's use of DVP accounts, as opposed to custodial accounts, demonstrates that the Purchased Securities were not to be used for "conventional investment, trading or participation in the securities market."  Baroff, 497 F.2d at 284.  Additionally, LBI did not use the Purchased Securities "for the benefit of" the Banks.  Black's Law Dictionary (5th ed. 1979).  Indeed, virtually all the factors on which Baroff relied in concluding that there was no fiduciary relationship are present here.  LBI did not sell the Purchased Securities to facilitate further securities trading on behalf of the Banks or use the Purchased Securities to make margin purchases of further securities on behalf of the Banks.  The Banks had no reasonable expectation that LBI would sell or use the Purchased Securities in the near future for these purposes on behalf of the Banks. To the contrary, LBI used, and was permitted by the Agreements to use, the Purchased Securities in its own day-to-day business. LBI had acquired title to the Purchased Securities through the Agreements and, as was its right, used the Purchased Securities as collateral or for other repurchase agreements.  LBI's use of the Purchased Securities thus had no connection with the Banks' trading activity in the securities market.[5]  See Baroff, 497 F.2d

---

[5] The Banks attempt to distinguish Baroff as turning solely on

at 284.

The Agreements are akin to the secured loans that were denied "customer" status in <u>Secs. Investor Prot. Corp. v. Exec. Secs. Corp.</u>, 556 F.2d 98, 99 (2d Cir. 1977) (per curiam).  In <u>Exec. Secs. Corp.</u> the appellants sought "customer" status under SIPA based on the following transaction with a broker-dealer:

> Appellants entered into secured loan agreements with Executive Securities Corporation, a broker-dealer, whereby <u>they lent securities</u> to Executive <u>in return for cash collateral equal to the market value of the shares</u>.  Each party retained the right to "mark to market," that is, on one day's notice, appellants could demand additional cash if the market value of the shares had increased.  Similarly, Executive could demand a return of cash collateral if the value of the securities declined.

<u>Id.</u> (emphasis added).  Observing that "Appellants were secured creditors and retained a contractual right to demand additional cash collateral from Executive in the event the securities lent rose in value," the Second Circuit concluded that these secured loan agreements did not "bear the indicia of the fiduciary relationship between a broker and his public customer" and denied "customer" status to the Appellants.  <u>Id.</u> (citing <u>Baroff</u>).  The Agreements have the same mark-to-market protection as the secured loans at issue in <u>Exec. Secs. Corp.</u>  Like the

---

the absence of investment intent, which they assert exists here. The absence of investment intent was just <u>one</u> of the many indicia on which <u>Baroff</u> relied as demonstrating the absence of a fiduciary relationship.  Even if investment intent existed here, such intent is insufficient on its own to conclude that a fiduciary relationship exists.

appellants in Exec. Secs. Corp., the Banks are not SIPA customers.

The parties devote significant portions of their briefs to debating the proper economic characterization of repurchase agreements, namely whether they are better understood as purchases and sales of securities or as loans secured by the securities. See SEC v. Drysdale Secs. Corp., 785 F.2d 38, 41-42 (2d Cir. 1986) (recognizing the similarities and differences between repurchase agreements and loans secured by securities). The Banks contend that their transactions should be equated with a purchase and sale of a security. This debate is unnecessary.[6] A purchase/sale bears even fewer indicia of a fiduciary relationship than a secured loan, as a creditor has greater fiduciary obligations to the debtor than a purchaser does to a seller. See, e.g., Marine Midland Bank v. CMR Indus., 559 N.Y.S.2d 892, 897 (N.Y. App. Div. 1st Dep't 1990) ("Under both the common law and the Uniform Commercial Code, a secured party has a duty to exercise reasonable care in the custody and preservation of collateral in its possession." (citation omitted)). Accordingly, if a secured loan lacks the indicia of

_____

[6] The weight of authority in this Circuit supports the conclusion that repurchase agreements are more akin to secured loans. See, e.g., Capital Management Select Fund Ltd. v. Bennett, 680 F.3d 214, 221 n.5 (2d Cir. 2012); Miller Tabak Hirsch & Co. v. Commissioner, 101 F.3d 7, 8 (2d Cir. 1996); United States v. Manko, 979 F.2d 900, 902 (2d Cir. 1992).

a fiduciary relationship necessary for a finding of entrustment,
Exec. Secs. Corp., 556 F.2d at 99, then a purchase/sale
certainly cannot meet the entrustment requirement.[7]  Thus, no
matter how the Agreements are characterized, the Banks are not
entitled to "customer" status under SIPA.  See also In re ESM
Government Secs., Inc., 812 F.2d 1374, 1376-77 (11th Cir. 1987)
(relying on Exec. Secs. Corp. to conclude that a standard
repurchase agreement did not entitle the claimant to "customer"
status under an analogous provision of the Bankruptcy Code).
The Bankruptcy Decision is therefore affirmed.

     The Banks make essentially three arguments, none of which
is persuasive.  In their first and principal argument, the Banks
argue that Baroff held that entrustment exists when the claimant
conveys the cash or securities to the broker-dealer for "some
purpose connected with participation in the securities markets."
Baroff, 497 F.2d at 283.  The Banks then assert that they
entered the repurchase agreements with the purpose of acquiring
positions in certain securities markets.

     In making this argument, the Banks read the fiduciary

---

[7] The Banks attempt to distinguish Exec. Secs. Corp. as turning
solely on the absence of trading accounts.  While the absence of
trading accounts was mentioned in Exec. Secs. Corp., the clear
thrust of the decision was the Court of Appeals' determination
that the holder of a secured loan is a creditor, not a
fiduciary.  556 F.2d at 99.  Moreover, the DVP accounts here are
not "trading accounts," as that term was used in Exec. Secs.
Corp.

relationship requirement out of entrustment.  The argument fails on a number of accounts.  First, an entrustment requires a fiduciary relationship.  <u>See</u> <u>Chestman</u>, 947 F.2d at 568-69.

Furthermore, in making this argument, the Banks ignore the full context of the words in <u>Baroff</u> on which they rely. According to <u>Baroff</u>, Congress intended for SIPA to protect the "public customer <u>who has entrusted securities to a broker</u> for some purpose connected with participation in the securities markets."  497 F.2d at 283 (emphasis added).  Thus, the element of "entrustment" is distinct from the "purpose" of the engagement.  The former speaks to the nature of the relationship between the claimant and the broker-dealer, whereas the latter speaks to the purpose of the transaction.  The myopic focus on the purpose of the transaction, to the exclusion of the nature of the relationship, is at odds with Second Circuit precedent, which has consistently emphasized the importance of a fiduciary relationship between the claimant and broker-dealer in demonstrating entrustment.  <u>See, e.g.</u>, <u>New Times</u>, 463 F.3d at 128; <u>Exec. Secs. Corp.</u>, 556 F.2d at 99; <u>Secs. Investor Prot. Corp. v. Morgan, Kennedy & Co., Inc.</u>, 533 F.2d 1314, 1317-18 (2d Cir. 1976); <u>Baroff</u>, 497 F.2d at 283-84; <u>see also</u> <u>Appleton v. First Nat. Bank of Ohio</u>, 62 F.3d 791, 801 (6th Cir. 1995); <u>In re Stalvey & Associates, Inc.</u>, 750 F.2d 464, 470-73 (5th Cir. 1985); <u>SEC v. Ambassador Church Finance/Development Group, Inc.</u>,

679 F.2d 608, 613-14 (6th Cir. 1982).

Additionally, adoption of the Banks' position would contravene Congress's intent in enacting SIPA.  Claimants may enter into many different kinds of transactions that are motivated by the desire to participate in the securities market. Permitting all such claimants to qualify for "customer" protection under SIPA would undermine Congress's purpose that SIPA protect customers "as investor and trader, <u>not</u> . . . others who might become creditors of the broker-dealer for independent reasons." <u>Baroff</u>, 497 F.2d at 284 (emphasis added).  The Second Circuit has consistently rejected granting ordinary debtor-creditor transactions "customer" protection under SIPA, <u>e.g.</u>, <u>Exec. Secs. Corp.</u>, 556 F.2d at 99, and this Court rejects the Banks' invitation to expand that which is intended to be narrowly drawn.  <u>See</u> <u>New Times</u>, 463 F.3d at 127.

Finally, it bears repeating that the facts cited by the Banks do not suggest a fiduciary relationship with LBI.  The Banks emphasize certain rights they had with respect to the securities, such as the right to demand return of the securities at any time and the right to demand return of the exact same securities.  But these are contractual rights, which do not create a fiduciary relationship.  <u>See</u> <u>Restatement (Third) Of Agency</u> § 1.01 cmt. g ("In any relationship created by contract, the parties contemplate a benefit to be realized through the

other party's performance.  Performing a duty created by
contract may well benefit the other party but the performance is
that of an agent only if the elements of agency are present.").
Thus, the Banks have failed to establish the indicia of a
fiduciary relationship necessary to prove entrustment and
thereby to acquire "customer" status under SIPA.

In making their second principal argument, the Banks rely
on Bevill Bresler, in which claimants who had entered repurchase
agreements with the bankrupt entity were deemed "customers"
under SIPA.  Bevill Bresler, however, concerned the short-term
repurchase agreement market, which "performs several vital roles
in the nation's economy."  67 B.R. at 567.  The bankrupt entity
in Bevill Bresler served as a "vital" market maker in the short-
term repurchase agreement market, matching parties holding
securities with parties holding excess idle cash.  Id. at 601.
The Bevill Bresler court thus distinguished Baroff and Exec.
Secs. Corp. by finding that, because the claimants were
investing and trading in the securities market through customer
accounts with the bankrupt entity, the transactions arose out of
a typical fiduciary relationship between a broker-dealer and its
customers.  Id. at 600-02.

Bevill Bresler is not helpful to the Banks.  Unlike the
short-term repurchase agreements at issue in that case, the
Agreements here were long-term repurchase agreements, spanning

23

at least five years and with terms as long as fifteen years.
Moreover, LBI's involvement in the long-term repurchase
agreement market was not as a market maker.  Additionally,
unlike the claimants in Bevill Bresler, the Banks had DVP
accounts, not ordinary customer accounts used for investing and
trading.  Thus, Bevill Bresler does not suggest that the
Agreements created a fiduciary relationship between the Banks
and LBI.

Finally, the Banks argue that the Bankruptcy Court erred by
misconstruing congressional intent.  The Banks argue that,
because Congress amended SIPA in 1978 to exclude securities
lending but failed to exclude repurchase agreements, it should
be presumed that Congress did not intend any exclusions beyond
that of securities lending.  The Banks further argue that,
because the House of Representatives version of the recent Dodd-
Frank Act amended the SIPA "customer" definition to exclude
repurchase agreements, but the final version of the Act made no
such amendment, it should be presumed that Congress considered
and rejected the exclusion of repurchase agreements from SIPA's
"customer" definition.

These arguments fail under basic principles of statutory
interpretation.  The Banks' argument of negative implication
regarding the 1978 amendments relies on the interpretive canon,
expressio unius est exclusio alterius, i.e., "expressing one

item of an associated group or series excludes another left unmentioned." Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 80 (2002) (citation omitted).  That canon only applies, however, if "it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." Marx v. General Revenue Corp., 133 S. Ct. 1166, 1175 (2013) (citation omitted). Generally this requires "identifying a series of two or more terms or things that should be understood to go hand in hand, which is abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded." Echazabal, 536 U.S. at 81.  The Banks have failed to identify any basis to conclude that, in 1978, Congress was considering repurchase agreements, or that securities lending and repurchase agreements necessarily go hand in hand. Accordingly, the negative implication argument fails.

The Banks' argument regarding the Dodd-Frank Act fails for a different reason.  It is undisputed that the version of SIPA prior to the passage of the Dodd-Frank Act is applicable to this case.  By invoking the legislative history of the Dodd-Frank Act, the Banks seeks to rely on post-enactment legislative history.  It is well established, however, that "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." Bruesewitz v. Wyeth LLC, 131 S. Ct. 1068, 1081 (2011); see also United States

25

v. Price, 361 U.S. 304, 313 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.").  Accordingly, the Dodd-Frank Act's legislative history is not available to construe the term "customer" in this case.[8]

CONCLUSION

     The Bankruptcy Decision of June 25, 2013 is affirmed.


     SO ORDERED:

Dated:     New York, New York
           February 26, 2014



                              _____
                                        DENISE COTE
                              United States District Judge

---

[8] Having affirmed the Bankruptcy Decision on the dispositive issue that the Banks fail to meet the entrustment requirement for "customer" status under SIPA, the remaining issues raised by the parties on appeal -- which are extensive -- need not be resolved.